EXHIBIT A

ARTICLES OF AGREEMENT

entered into by and between

MASONRY INSTITUTE OF SOUTHERN ILLINOIS

And

BRICKLAYERS LOCAL #8 OF ILLINOIS

BELLEVILLE CHAPTER

This Agreement is made and entered into as of the first day of August 1998, and between the Masonry Institute of Southern Illinois (Association) on behalf of those employers that have assigned to it their bargaining rights and any other employers that has not assigned its bargaining rights to the Association but wishes to accept and bind itself to the terms hereof by signature below (all collectively referred to as "Employer") and Bricklayers Local #8 of Illinois, Belleville Chapter, (hereinafter collectively referred to as "Union").

WHEREAS, Bricklayers Local #8 of Illinois of the International Union of Bricklayers and Allied Craftworkers desire to negotiate a single collective bargaining agreement with the Association and other independent contractors covering their members and others working under this Agreement (hereinafter referred to as "employees") and

WHEREAS, the Association and other independent contractors and the Union desire to negotiate a single collective bargaining agreement incorporating the relevant provisions of past collective bargaining agreements with the Local Union including any amendments thereto and the "Working Code" thus eliminating the necessity for any separate documents other than that which is agreed to below, and

WHEREAS, it is the intent of the parties hereto to abide by all applicable Federal and State statues and rules and regulations made pursuant thereto. If any provisions of this Agreement is restrained by such tribunal pending a final determination as to its validity, then such provision or provisions shall continue in effect only to the extent permitted and all other provisions of the Agreement shall remain in force and effect.

In the event that any provision of this Agreement is held invalid, or enforcement of or compliance with any provision is restrained, the Union and the Employer shall enter into immediate collective bargaining negotiations for the purpose of arriving at a mutually satisfactory replacement, incorporating the substance of such provision to the extent allowable under the law, to be in effect during the period of invalidity or restraint.

If the Local Union should enter into an agreement which provides for terms or conditions of employment which are more favorable than those contained in this Agreement for specific projects, particular segments of the masonry market or certain geographic areas, those same terms and conditions of employment will be made available to the Employer on the specified projects, particular segments of exceptions to this provision are those initial agreements that are signed with newly organized employers to provide a bridge between those rates which are initially established and those which prevail for signatory contractors in the masonry market in which the newly organized contractor is going to operate.

It is therefore agreed as follows:

# ARTICLE I
## Union Security

**Section 1. Voluntary Recognition.**

Inasmuch as the Union has submitted proof and the Employer is satisfied that the Union represents a majority of its employees in the Bargaining Union described herein, the Employer recognized the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining agent for all employees within that bargaining unit, on all present and future jobsites within the jurisdiction of the Union, unless and until such time as the Union loses its status as the employee's exclusive representative as a result of an NLRB election requested by the employees. The Employer agrees that it will not request an NLRB election.

**Section 2. Future Recognition.**

The Employer agrees that if it has not previously done so, it will, upon the Union's submission of evidence of majority status among its employees in the bargaining unit described herein, voluntarily recognize the Union, pursuant to Section 9(a) of the National Labor Relations Act, as the exclusive collective bargaining representative of all employees within that bargaining unit on all present and future jobsites within the jurisdiction of the Union. The Employer expressly agrees that it will not condition its recognition upon the results of an election conducted under the rules and regulations of the National Labor Board.

**Section 3.**

All present employees of the Employer who are members of the Union on the date of execution of this Agreement shall remain members of the Union during the term of this Agreement as a condition of continued employment, subject to the provisions contained in Section 8 of the National Labor Relations Act, as amended. All other present employees and all new employees shall, as a condition of employment or Apprentice training, make application for membership in the Union within eight (8) days following the effective date of this Agreement, or the beginning of such employment, whichever is later, and shall maintain such membership in good standing during the term of this Agreement subject to the provisions contained in Section 8 of the National Labor Relations Act, as amended.

If any lesser number of days is established as a minimum requirement for acquisition of membership by Federal statue under a Union security clause, such lesser number of days shall apply and be substituted herein above.

Failure of any employee to comply with the provision of this subsection shall, upon request of the Union, result in termination of such employee, provided that the Union has given the employee four (4) days notice that his obligation to make payment has not been met and that his delinquency renders him liable to termination under this section.

Employer shall not be obligated to dismiss any employee for non-membership in the Union: (a) if he has reasonable grounds for believing that such membership was not available on the same terms and conditions generally applicable to other members, or (b) if he has reasonable grounds for believing that such membership was denied or terminated for reasons other than the failure of the employee to render periodic dues and initiation fees uniformly required as a condition of acquiring membership.

2

# ARTICLE II
## Hiring Hall

**Section 1.** In order that the Employer shall have a competent working force and to promote efficiency and safety of operation the Employer and the Union agree that:

(a) The Chapter will maintain a current out of work list (the "List") of persons available for employment.

(b) The Employer may request, by name, from a list maintained by the Chapter having jurisdiction, available members of that Union who have special skills or previous work experience with the Employer within the preceding ninety (90) days. First employee on the job shall be the Steward appointed by the Field Representative. Recall employees not to exceed 50% of the crew.

(c) The Employer in requesting referral of applicants per (b) shall specify to the Union, (1) the number of applicants to be employed; (2) the work to be performed; (3) the location of the project; (4) the nature of the construction project; and (5) such additional information as is deemed pertinent by the Employer in order to enable the Union to make proper referral of applicants including confirmation, prior to completion of the first working day, by name, of any person hired per (b).

(d) The Union will not discriminate either in the maintenance of its List or in its referrals for employment against any person because of his membership in the Union or, race, sex, religion, age or national origin. The registration of and selection of applicants for referral shall not be based on, or in any way affected by, Union membership, by Union by-laws, rules, regulations, constitutional provisions or any other aspect of obligation or Union membership.

(e) The Union shall refer to the Employer such applicants as are competent to fulfill the requirement of registrants and who have acquired experience and possess the requisite skills of the vacant positions as specified by the Employer.

(f) If for any reason the Union is unable to furnish qualified and competent applicants within forty-eight (48) hours from the time the request is made (providing the said forty-eight (48) hours does not include Saturdays, Sundays or Holiday); the employer may secure applicants from other sources, provided they are members of the B.A.C. International Union. The Employer must offer proof; (1) that the Employer has contacted the proper representative of the Union who has the authority to place employees on the job, and  (2) that the Employer has provided the proper representative of the Union with the exact time, date and location of the job site upon which the employees were requested to be furnished.

(g) The parties agree it is desirable to stabilize employment in the industry by granting the preference of employment to experienced persons. They recognize that the knowledge and experience of the Union within the industry, together with the sources of competent manpower available to make it the logical provider of employees. It is therefore agreed that the Employer shall notify the Union whenever employees are to be hired and shall afford the Union the opportunity to recommend job applicants consistent with the provision of the National Labor Relations Act of 1947, as amended. The Employer shall upon notice from the Union, immediately terminate the employment of any employee hired prior to such notice.

**Section 2.** The parties agree each will indemnify and save the other harmless from any and all claims and damages that either might suffer as a result of the operation of this Article II.

3

SECTION 4. The Territorial jurisdiction of The Belleville Chapter of Bricklayers and Allied Craftworkers Local #8 of Illinois is as follows: MONROE, ST. CLAIR, CLINTON, WASHINGTON, MARION, MADISON, BOND, FAYETTE, JERSEY, MONTGOMERY, CALHOUN and the SOUTHERN ¼ OF MACOUPIN COUNTIES.

## ARTICLE VI
## Wages

SECTION 1. Wages and fringe benefits for Journeymen shall be:

| | |
|---|---|
| August 1, 1998 thru July 31, 1999 | See Addendum A |
| August 1, 1999 thru July 31, 2000 | See Addendum B |
| August 1, 2000 thru July 31, 2001 | See Addendum C |
| August 1, 2001 thru July 31, 2002 | See Addendum D |
| August 1, 2002 thru July 31, 2003 | See Addendum E |

The amount of fringe benefit stamps shall be the same for all of the Belleville Chapter and the one stamp plan shall be administered through Bricklayers Local #8 Belleville Chapter Fringe Fund.

For foreman wages see Article IX
For Apprentice wages see Article VIII

SECTION 2.

(a) On all free standing stacks, for every 25 feet above 50 feet in the air, employees shall be paid 25 cents per hour over the prevailing scale.

(b) On all sewer work, manholes, etc. over 6 feet in depth, employees shall be paid 25 cents per hour over the prevailing scale; on tunnel work, 50 cents per hour over the prevailing scale. Any work under pressure; 75 cents per hour over the prevailing scale.

SECTION 3.

(a) All employees working under this Agreement, shall be paid in cash or check, weekly. Pay day to be established by contractor. Notification of any day other than Friday, to be given in writing to the Field Representative and/or President of BAC Local #8, or Friday will be the established pay day. No more than three (3) days of wages shall be kept back on a weeks work. Checks will be issued on pay day no later than one hour prior to quitting time. All pay checks must have fringe benefit stamps included or check will not be accepted by the employee.

(b) When an employee is discharged or laid off, he may be paid off by check sent by Priority Mail within 24 hours of said discharge or layoff. If the paycheck is available at discharge or layoff time, the employer will send by Priority Mail the check stub and fringe stamps within 24 hours of said discharge or layoff. If not paid, the employee(s) shall be entitled to time at the regular rate of wages for each hour thereafter until paid. Another check will be reissued after 72 hours of compliant.

(c) Employees may wait on the job, up to 1½ hours, on their own time, but if employees are requested to remain on the job, they shall be paid from the A.M. starting time. If they are requested to return to work 1½ hours after normal starting time due to weather conditions, they will be paid for all hours worked.

(d) When employees are sent home because of bad weather and are instructed to report back to work at noon, they may do so, and if they report to work, they shall be paid not less than 4 hours pay.

(e) Any employee properly referred by the Union at the request of the Employer, who reports to work and is not thereafter put to work through no fault of his own, but due to Employer negligence, shall receive a minimum of four (4) hours pay, except for inclement weather. Any employee who is currently employed, if called out for a job and thereafter not put to work, shall be paid a minimum of two (2) hours pay, except for inclement weather. If required by the Employer, the employee must remain on the job for the two or four hour period.

(f) All pay stubs MUST INCLUDE: FULL DATE (month, day, year) and CONTRACTORS NAME and ADDRESS.

SECTION 4. An employee shall be paid at the regular rate of pay while going from one job to the other during their working hours, and in no case may they be moved during their lunch hour, or half hour, as the case may be.

SECTION 5. On those paydays, when an employee does not work, the Employer shall pay the employee (employees) at the job site by 10:00 a.m. if the Employer does not comply with these provisions, employees shall be paid waiting time from scheduled starting time.

SECTION 6. Any individual, partnership, or corporation having been granted the privilege of paying by check, and thereafter fails to have sufficient funds in the bank to meet all pay checks issued to members of the Union in his employ, shall be penalized to the extent of a sum not less than the expense incurred in collecting the amounts due, as well as depriving such defaulting Employer the right of paying by check for a period of time not more than six (6) months. All payments made during six (6) month period shall be made by Cashiers Check.

## ARTICLE VII
## Hours and Overtime

SECTION 1.

(a) Work week shall be Monday thru Friday, eight (8) hours shall constitute a days work, between the hours of 8:00 a.m. and 4:30 p.m. The hours may be waived by mutual consent of the Employer and the Field Representative of the Union.

(b) All work on holidays: New Year's Day, Memorial Day, Fourth of July, Labor Day, Veterans Day, Thanksgiving Day and Christmas Day, shall be paid at double the regular rate of pay for all hours worked, plus full fringe benefit stamps on all paid hours. When any of these days shall fall on Sunday they shall be celebrated on the following Monday.

(c) All hours worked in excess of eight (8) hours in a day, Monday through Friday, shall be paid at the one and one-half hourly rate of pay, plus full fringe benefit stamps on all paid hours. All employees working on the job shall be given the opportunity to work overtime if they so desire.

(d) All hours worked on Saturday shall be paid at the one and one-half hourly rate of pay, plus full fringe benefit stamps on all paid hours.

(e) All hours worked on Sunday or Holidays shall be paid at double the regular hourly rate of pay plus full fringe stamps on all paid hours.

SECTION 2.

(a) Lunch time shall be thirty (30) minutes, four (4) hours after starting time. Any employee required to work through his lunch period, the one and one-half (1 ½ ) hour period commencing four (4) hours after starting time, shall be allowed a thirty (30) minute period to eat his lunch, and he shall receive an additional thirty (30) minutes pay at the overtime rate. The ONLY exception to this rule are employees involved on grouting operations, will have a flexible lunch period starting no earlier than 11:00 a.m. and ending no later than 1:00 p.m. with no additional pay. This does not apply to refractory work.

(b) All employees shall leave the tool shed at starting time and quit five (5) minutes before lunch, and five (5) minutes before quitting time. The starting and quitting time allowance also applies to shift work.

(c) When employees work their regular eight (8) hour shift on shift work and continue to work two (2) hours past their regular quitting time, they shall be allowed thirty (30) minutes to eat their lunch at that time, and shall be given lunch at four (4) hour intervals thereafter. If less than two (2) hours, they shall be paid at the overtime rate of pay for lunch. (This does not apply to foreman's relieving time).

(d) On shift work, differential pay (one (1) hour at straight time) shall be paid at the rate of total hourly package including full fringe benefit stamps for each shift worked Sunday through Saturday.

(e) No employee shall be allowed to work on more than one shift in any twenty-four (24) hour period. Shifts shall start at 8:00 a.m. and run to 8:00 a.m. the following day.. No shift shall be longer than twelve (12) hours.

(f) No work shall be performed on Saturday, Sunday or holidays, nor shall there be any overtime, work as covered by the Collective Bargaining Agreement without the express permission of the Field Representative of the respective Union. In case of extreme emergency, MONDAY thru FRIDAY, 2 hours of work may be performed after 4:30 p.m. at the overtime rate, and the Union will be notified within a twenty-four (24) hour period.

SECTION 3. Presidential Elections: All employees covered under this Agreement shall be excused from work two (2) hours early with pay for one (1) hour, for voting in all U.S. Presidential elections. Only those two (2) hours shall be the last two (2) hours of the working day.

### ARTICLE VIII
### Apprentices

SECTION 1. It shall be the duty of all apprentices to work faithfully for their Employers, their working hours are the same as Journeymen.

SECTION 2. Any Employer requesting an Apprentice shall make application to the Belleville Chapter Apprentice Committee. In turn, said Apprentice Committee shall abide by rules, regulations and standards of the Local Apprenticeship Committee and U.S. Dept. Of Labor, Bureau of Apprenticeship and Training.

10

SECTION 3. Apprentice Percentage Wage Rates (based on Journeyman total wage package, including fringes).

August 1, 1998 thru July 31, 1999   See Apprentice Addendum A
August 1, 1999 thru July 31, 2000   See Apprentice Addendum B
August 1, 2000 thru July 31, 2001   See Apprentice Addendum C
August 1, 2001 thru July 31, 2002   See Apprentice Addendum D
August 1, 2002 thru July 31, 2003   See Apprentice Addendum E

SECTION 4. When an Employer has been in business within the jurisdiction covered by this Agreement for a period of not less than one (1) year, he shall be entitled to apply for one (1) apprentice. When said apprentice has served two (2) years, such Employer shall be entitled to apply for one (1) additional apprentice and shall employ no more apprentices until the second apprentice has served three (3) years of his apprenticeship. No improvers shall be employed by an Employer employing two (2) or more registered apprentices, unless approved by the Belleville Chapter Apprenticeship Committee.

SECTION 5. No Employer shall employ an apprentice on approval without consent of the Belleville Chapter Apprenticeship Committee, in no event shall consent for such employment be for more than the Belleville Chapter Apprenticeship Committee's specified time.

SECTION 6. Employers shall keep their regular indentured apprentices employed at all times the Employer has Journeymen bricklayers working for him, at a ratio of at least three (3) Journeymen bricklayers for each apprentice he employs.

SECTION 7. No apprentice shall work on any saw over two(2) hours a day until he has worked at the trade for at least 2250 hours.

SECTION 8. It shall be the duty of the Employers employing apprentices to instruct them in the reading of plans and the laying out of work.

SECTION 9. Every effort shall be made to keep the apprentice laying brick as much as possible.

### ARTICLE IX
### Foreman

(a) A foreman shall lay out all work performed by his men.

(b) No foreman shall discriminate against employees nor shall he use his position to unduly harass or mistreat employees working under him.

(c) No member of the Union shall act in the capacity of foreman unless duly appointed by his Employer, and he shall be paid wages in accordance with the wage scale agreement.

(d) No employee shall be allowed to work under any foreman who is not a Journeyman of the International Union of Bricklayers & Allied Craftworkers, nor shall any Journeyman or apprentice allow any person other than a bricklayer to lay out work for him or to plumb or level any part of his work.

11

(e) Any brick contractor having two (2) or more men on any one job must have a foreman on the same. All foremen shall commence work one half (½) hour before the regular established starting time on all jobs and receive one (1) hour pay as starting time allowance. Foreman shall receive $1.00 per hour over the journeyman rate on all jobs, plus starting time.

(f) Any foreman starting one half (½) hour early on any shift shall be paid one (1) hour wages and full fringe benefits, and his starting time will be due and payable to the foreman at the commencement of the shift.

(g) Employer may act as his own foreman if he is on the job, but cannot act as a foreman on more than one job. When a foreman starts a job, he will work if hod carriers work on said job, in the performance of his duties. On a job employing eight (8) bricklayers, the working foreman shall become a non-working foreman. When thirteen (13) bricklayers, including the working foreman are employed on a job the working foreman shall be appointed. When sixteen (16) bricklayers are employed on a job the working foreman shall receive starting time. When twenty (20) bricklayers are employed on a job a second working foreman shall be appointed on the job and for every eight (8) bricklayers after twenty (20) there shall be another working foreman appointed. All working foreman after sixteen (16) bricklayers are employed shall receive starting time.

(h) Single family dwelling has no non-working foreman.

(i) Any Employer who is not a practical bricklayer must have a bricklayer foreman.

(j) Secondary foreman on the project shall have at least six (6) months membership in good standing with the Union.

(k) On refractory work, first non-working foreman shall be designated as General Foreman and shall be paid $1.00 above the highest journeyman hourly rate of pay.

(l) Superintendent to be designated by Employer and to receive not less than $2.00 above the highest paid journeyman hourly rate of pay.

## ARTICLE X
### Stewards

SECTION 1. All Stewards will be appointed by the Field Representative. If necessary the appointed Stewards shall name an assistant.

SECTION 2. At no time shall a Steward be discharged for performing his duties as Steward.

SECTION 3. There shall be no rules, customs, or practices permitted that will limit the amount of work an employee shall perform during the working day.

SECTION 4. It shall be the responsibility of the Employer to notify the Field Representative before starting the job, at which time the Field Representative shall assign or place a Local Union Steward on the job, and said Steward shall remain until the completion of job unless otherwise mutually agreed. It shall be the responsibility of Field Representative to place reliable competent mechanics on as Stewards.

12

SECTION 5. The Steward shall be allowed time to check books, scaffold, pay checks and sell permits during his normal working hours without loss of pay.

SECTION 6. Superintendent, Foreman and Stewards shall investigate all safety hazards and report same to Employer and Union as soon as possible to seek a solution to correct the safety problem.

SECTION 7. WHENEVER A LAYOFF OCCURS, THE EMPLOYER SHALL NOTIFY THE STEWARD AND THE MAN TO BE LAID OFF ½ HOUR BEFORE QUITTING TIME.

SECTION 8. Should any member take sick or meet with an accident on the job where he is employed, it shall be the duty of the Steward to see that the member is properly cared for. Should the Steward himself be the unfortunate party, then some member shall immediately take charge. Loss of time by the Steward or party in charge, on the date of the injury only, shall be defrayed by the Mason Contractor. The Union office shall be notified immediately of any such sickness or accident.

SECTION 9. Each Steward on the job is to see that the laws of the Union are enforced. The Steward and Foreman shall see that all work is done in a workman like manner as to not destroy the true principles of the Trade.

## ARTICLE XI
### Working Conditions

SECTION 1.

(a) When an Employer takes a job that will give work to five (5) or more employees for fifteen (15) days or more, he shall furnish a suitable room for the exclusive use of the bricklayers for the purpose of keeping their tools, clothes and eating their lunch. Such room is to be heated in cold weather and proper lighting provided.

(b) In case of fire or theft of the tools or clothing of the employees placed in tool house or shanty, the Employer shall be held responsible for same, which shall not exceed $250.00 for tools and clothing. Employers have the right to replace same with comparable quality tools. This shall apply to all jobs.

(c) All Employers shall furnish clean drinking water, with cups, on all jobs year round. From May 1st to October 1st, ice water shall be provided.

SECTION 2.

(a) All scaffolding shall meet the standards and procedures under the OSHA regulations and wide enough to allow 18 inches minimum working room between the wall and materials.

(b) Scaffold height for all brick work shall be five (5) foot. Scaffold height for all block work shall be four (4) foot except when backing up brickwork which shall not exceed fifty-six (56) inches in height.

(c) No employees shall be allowed to work on a scaffold while material is being boomed onto said scaffold by material company truck.

13

(d) No material shall be stacked higher than forty-eight (48) inches from the level of the employees' feet. The Employer shall insure that all material, whether stocked off by hod carrier, or boomed on scaffold, shall abide by the forty-eight (48) inch rate.

(e) Any masonry wall thirteen (13) inches or over in thickness must be backed up in conjunction with the face material every eight (8) or sixteen (16) inches in height, or have scaffolding on both sides.

(f) All mortar boards are to be placed at the height most convenient for the employee to work.

(g) Ladders shall be furnished by the Employer on all job sites when an employee is required to climb. A separate ladder or escape route, other than the one used by the laborers, shall be furnished.

(h) Tools must be raised and lowered by operator on job sites that require them when scaffold is above twenty (20) feet.

(i) In no case shall there be lost time due to the building or stocking of scaffolds, or lack of materials if within the Employers control.

(j) In no case shall there be any lost time due to rain, unless the Employer declares job not working and sends all affected employees home.

SECTION 3.

(a) No machinery, tools or labor saving devices shall take the place of the trowel to spread mortar.

(b) All units of masonry weighing forty-five (45) pounds or more shall be handled by two (2) bricklayers, except where conditions prevail that will not permit more than one (1) man to handle such material. Eight (8) inch concrete block layed above forty (40) inches high will be handled by two (2) men, also, twelve (12) inch Haydite blocks.

(c) A line must be used on all walls over six (6) feet in length.

(d) Employees shall not be required to work ahead of the line.

(e) In no case shall a line be put up more than one (1) course at a time, except where sills or other obstructions may occur and cannot be avoided.

(f) Speed leads, corner post or dead man leads may be used on permanent residential buildings (i.e. single family dwellings, apartments, duplexes, condos) profiles for fireplaces or interior residential brickwork. The speed leads, corner post or whatever method is used, shall be erected by the employees working on the job during the normal eight (8) hour working period. Any Employer whose major portion of brickwork (90%) is permanent residential buildings must make every opportunity available to the apprentice employees in the instruction of the use of the brick level. The Belleville Chapter Joint Apprentice Committee shall have the authority to move an apprentice to insure proper training of the apprentice in corner erection and level use.

SECTION 4.

(a) No employee shall be required or allowed, as a condition of employment, to move mortar mixers, scaffolds, scaffold braces, boards, or any other equipment belonging to the Employer, with his own vehicle or truck except said employee may move equipment on said job.

14

(b) All Employers shall be required to carry public liability insurance, workman's compensation insurance and unemployment insurance and shall furnish the Union with copies of insurance, annually.

## ARTICLE XII
## Safety

SECTION 1. All Employers are required to abide by all rules and regulations and standards set down by OSHA where employees are to perform work. Employees shall suffer no loss of time due to non-compliance by Employer with the above rules and regulations for the remainder of the day.

SECTION 2. All safety equipment required by the State and Federal laws, rules and/or regulations shall be furnished by the Employer at no cost to the employees.

SECTION 3. DRUG TESTING

DRUG ABUSE PREVENTION, DETECTION & AWARENESS PROGRAM FOR MEMBERS OF UNIONS WITHIN THE SOUTHWESTERN ILLINOIS BUILDING & CONSTRUCTION TRADES COUNCIL OF AFL-CIO

We are firmly committed to the safe and efficient construction and operation of all projects. The safety and health of project employees, and the quality of construction are of paramount concern. The use, possession, or distribution of drugs in the work place is inconsistent with the achievement of these objectives. There being a delicate balance existing between safety, health, efficiency and the interest of worksite employees' right to privacy, this program recognized that the union and the employer will not intrude into the off duty lives of workers or their right to privacy. The sole purpose of this policy is the elimination of impairment at the job site. It is recognized that on job impairment is often caused by underlying physical or emotional problems. For that reason, this program includes a drug and alcohol awareness orientation at their pre-employment screening. Accordingly, the parties agree that in order to enhance the safety of the work place, and to maintain a drug free work environment, individual employers may require employees to undergo drug screening by using the following procedures. This policy, and following procedures, are binding, and are mutually agreed to by the parties to this agreement.

1. It is understood that the use, possession, transfer or sale of illegal controlled substances is absolutely prohibited while employees are on the employer's job premises, or while working on any site in connection with work performed under the applicable agreements.

2. An employer or owner may declare a job site to be a drug testing site for all employees working on that site. If declared a drug testing site, all building trades persons must be tested before beginning work.

3. All employees will undergo tests for the following controlled substances:
   A. Amphetamines
   B. Barbiturates
   C. Benzodiazepines
   D. Cocaine
   E. Opiates
   F. THC (Marijuana/Canabinoids)
   G. Methadone
   H. PCP

15

The supervisor should remove the employee from the worksite where a confidential meeting can occur. If more than one employee is involved, they should be separated. The supervisor should explain what he/she has observed and ask the employee to explain why he/she appears to be physically or mentally unable to perform this job.

Remember, the supervisor is neither diagnosing nor accusing the employee of being "drunk" or "stoned", but acting on observed behavior. If the employee provides a satisfactory explanation for his/her behavior, the supervisor should make a further assessment to determine the reason that the employee appears unfit for duty. The supervisor must document all actions thoroughly. If the employee does not provide a satisfactory explanation, the supervisor should proceed with the following substance screening.

The following procedure may be used when the decision to conduct a test or assessment referral for "fitness for duty" has been made.

Testing Procedure

The supervisor and union steward and or another fellow Union member should escort the employee to a medical facility. The employee will be required to provide a urine specimen for testing.

The Occupational Health Nurse should be contacted if questions arise regarding testing procedures or specimen collection facilities.

The collection of urine specimens, the chain-of-custody of the specimen to a mutually agreed N.I.D.A. Laboratory, and the laboratory testing will be in accordance with the guidelines established by the National Institute on Drug Abuse, (N.I.D.A.).

After completion of the specimen collection, the employee should be relieved from duty and driven home. Final determination of status will be made following receipt of the test results.

After the Test - Meeting with the Employee - When test results are positive, a meeting with the employee and a Medical Review Officer (MRO), should be scheduled to tell the employee the test results, making sure that the results of the testing are held in the strictest confidence. Only after a meeting between the employee and a medical professional, will the employer be notified of a positive test.

5. All tests shall be conducted using only urine specimens in accordance with current State and Federal Department of Transportation Initial and Confirmatory Test Levels, (NG/MI). Sufficient amounts (a minimum of 60cc) of the sample shall be taken to allow for an initial test and confirmatory tests. All specimens shall be collected and handled according to strict chain-of-custody procedures, as established by N.I.D.A. The sample collection will not be observed directly. The testing procedure is designed to respect employees rights to privacy.

6. The initial test will be by Enzyme Multiplied Immunoassay Technique (EMIT). In the event of a question or a positive result arises from the initial test, a confirmation test must be utilized before action can be taken against the employee.

The confirmatory test will be by Gas Chromatography/Mass Spectrometry (GC/MS). Any other confirmatory tests and/or testing shall be at the employee's time and expense. Testing standards for both the initial test, and confirmatory test, will be those established by the national Institute of Drug Abuse. The testing lab used will conform to the standards of the National Institute of Drug Abuse. Confirmed

17

---

* This program does not prohibit the use or possession of any medication prescribed by the employee's physician, or any over the counter medication.

4. An Employer may require a fitness for duty determination for the following reasons:

Accidents - Employee involvement in accidents causing property of $4,400 or more or serious personal injury shall be grounds for requesting testing for alcohol or controlled substances to determine fitness for duty.

Observed Behavior - (Objective Criteria) - The supervisor is responsible for making an initial assessment as to whether an employee is "Fit for duty." Such a determination should be based on the supervisor's objective observation of an employee's ability to perform all duties safely and efficiently as well as the employees conduct and attendance. In making this determination, the supervisor is not "diagnosing" but merely noting "behaviors". In some instances an illness or disease may mimic the symptoms of alcohol or substance abuse. The company will not tolerate the use of this policy to harass or intimidate employees.

Patterns and Indications of a Substance Abuse Problem - The following lists some of the most commonly observed signs that an employee may not be fit for duty. These signs may be considered "for cause" events which will justify assessment for fitness for duty under this policy. This list is not all inclusive. Supervisors may observe other signs and symptoms similar to these that may prompt a request for a fitness for duty assessment.

General
1. An accident
2. Erratic behavior
3. Sudden mood swings
4. Excessive risk taking
5. Poor cooperation
6. Customer complaints
7. Frequent tardiness
8. Excessive absence
9. Frequent mistakes
10. Lack of energy or strength
11. Declining performance
12. Poor quality or quantity of work
13. Unexplained absences

Specific
1. Dilated or constricted pupils
2. Glassy or reddened eyes
3. Flushed face
4. Slurred speech
5. Alcohol or marijuana on the breath
6. Staggering or unsteady gait
7. Stumbling or falling
8. Abusive speech
   Monday/Friday, payday

If the supervisor determines that the employee is not fit for duty and after a job steward or another Union member has been contacted and observed the employee in question, the following assessment procedure should be used.

Procedures to be followed by a supervisor once it has been determined that a fitness for duty assessment is necessary

It is very important that a supervisor observing signs that an employee is not fit for duty should ask another supervisor to observe the employee for corroboration of the behavioral characteristics. All of the observing supervisors must have successfully completed training in a Fitness for Duty Policy Administration.

16

positive samples will be retained by the testing laboratory in secured long term frozen storage for a minimum of one year. Handling and transportation of each sample must be documented through strict chain-of-custody procedures; specimen containers shall be labeled with a number, and the donor's signature, and shall be closed with a tamperproof seal initialed by the donor and collecting agent. The labeling shall be done in the employee's presence. All specimen samples shall be collected at a mutually agreed medical facility such as a hospital, etc. Every effort shall be made to assure the validity and accuracy of all tests.

7. Employees will be advised of test results by an approved MRO. Results, or facts of testing, shall not be released to any owner, any other employer, or any other employee.

Employees shall receive copies of all documents, including, but not limited to, test results, computer printouts, graphs, interpretations and chain-of-custody forms. Results of the testing shall be held in the strictest confidence, in accord with the American Occupational Medical Association Code of Ethical Conduct for Physicians Providing Occupational Medical Services and the AOMA Drug Screening in the Workplace Ethical Guidelines; except as provided in this document.

Except as set forth herein, nothing should infringe on the worker's right to privacy, or job rights and security, as set forth in the collective bargaining agreement; nor shall this program intrude into the off-duty lives of the employees, except if the employee reports to work impaired.

It is the intent of this program to comply with all laws and regulations promoting non-discrimination in employment.

Except as set forth herein, no employee shall be required to sign any waiver of his rights.

8. Random physical searches and/or compulsory chemical testing shall not be permitted. However, in order for an Employer to guarantee the security of this program, that Employer may declare any new project to be drug free. All employees who work on that project site will be tested.

9. Employees with a negative test result shall be issued a "drugfree" card. Any employee possessing a "drug free" card, notwithstanding any other provision of this agreement, shall not be retested for a period of one year from issue date of the card, provided that, if an Employer seeks to retest employees within the one year period prior to the start of a new job, he may do so. Employees not passing the drug screen shall be removed from the employers payroll. The Employer agrees to pay the cost for administering the drug test.

10. Payment of all testing, will be at the expense of the Employers, or as negotiated with Employer groups and Unions signatory with this agreement. The Unions shall encourage their members to be tested at a time convenient to them on a voluntary basis during a six month period starting with the date this agreement becomes effective.

11. It is recognized by the parties to this agreement that the consensus of all is that alcohol should not be abused. No employer is expected to retain in his employment any employee whose work performance is impaired because of alcohol abuse.

12. Employment shall not be denied to any employee, on a subsequent job, who, although had a positive test, was subsequently retested pursuant to this program, and shown to be negative for drugs.

This program does not prohibit the use or possession of any medication prescribed by the employee's physician, or any over-the-counter medication.

18

13. Except as set forth herein, the establishment or operation of this policy shall not curtail any right of an employee found in any law, rule, or regulation. Should any part of this policy be found unlawful by a court of competent jurisdiction, or a public agency having jurisdiction over the parties, the remaining portions of the policy shall be unaffected, and the parties shall enter negotiations to replace the affected provision.

14. The Employer shall indemnify and hold the Union harmless against any and all claims, demands, suits or liabilities that my arise solely out of the Employer's application of this program.

SECTION 4.

(a) The Employer agrees to conform to all rules and regulations prescribed by the Occupational Safety and Health Act or applicable state standard.

(b) When employees are working on a job and other workmen are working above them, employees shall be provided with a proper covering by the Employer to protect them from danger. No employee shall be required to work in any hazardous location without proper safety precautions.

(c) Hard hats, goggles, respirators, and other safety equipment as required shall be furnished by the Employer at no expense to the employees.

(d) The Employer shall provide respirators to each employee as needed. When working with asbestos based materials, respiratory protective devices shall be appropriate for the hazardous material involved and the extent and nature of the work performed.

(e) Eye and face protection shall be provided on any work which presents potential eye or face injury.

(f) Employees involved in welding operations shall be furnished with proper welding hood and lenses for eye protection and protective clothing.

(g) All welding shall be adequately shielded to protect anyone in the vicinity.

(h) The Employer shall take suitable precautions to detect and prevent employees being exposed to toxic gases.

(i) Employers doing industrial work other than sand and cement and lime mortar shall furnish gloves and proper clothing protection, excluding shoes. If clothing protection is not furnished by Employer, the employees shall be entitled to an allowance of $3.00 per day, or portion thereof, for cleaning of personal clothing. Where employee is required to use his personal clothing and it is damaged, Employer shall be responsible for replacement of damaged clothing of comparable quality when such damage is found to be job related.

(j) Adequate lighting shall be provided.

(k) All accidents shall be promptly reported by the job steward to the Union and the Employer. The Employer agrees to establish a procedure for each project which will be reviewed at the pre-job conference to insure that prompt and competent medical attention is available for any workman injured on the job site.

(l) The Employer shall post in a prominent place at each job site pertinent medical and insurance information.

19

ARTICLE XIII
Stamp Purchases - Fringe Benefit Funds

SECTION 1. The Employer agrees to deduct from the pay of all employees covered by this agreement; dues, assessments, vacation pay, as defined by this contract. The Union must present to the Employer executed authorizations from each employee for such deductions. No deduction shall be made which is prohibited by applicable law.

SECTION 2. It is understood that the Employer's contribution to the appropriate Pension Fund, Health & Welfare Fund, Vacation Fund, Apprenticeship and Training Trust Fund, Masonry Industry Fund, International Masonry Institute, Local #8 Annuity Fund and the International Union Pension Fund will also be included in the price of the stamp. Payments made for all funds and all deductions will be remitted by the selling entity directly to the Trustees by the respective funds and/or the Union in the appropriate amount for each fund or deduction.

SECTION 3. PENSION - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum per hour for each paid hour within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 4. WELFARE - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 5. VACATION PLAN - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 6. LOCAL #8 ANNUITY - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 7. APPRENTICESHIP and TRAINING TRUST FUND -

(a) The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour to the Belleville Chapter Apprenticeship and Training Trust Fund for work performed within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

(b) The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour to the International Masonry Apprenticeship Trust Fund for work performed in the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 8. MASONRY INDUSTRY FUND - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour into the Masonry Industry Fund; the Bricklayers Local #8 Belleville Chapter Fringe Fund agrees to distribute the negotiated rate, at no cost to the Employer, into the Masonry Industry Fund and the International Masonry Institute for market development and research and development.

The payments required above shall be made to the International Masonry Institute which was established under an Agreement and Declaration of Trust, March 14, 1981, as a successor trust to the predecessor International Masonry Institute reestablished under an Agreement and Declaration of Trust July 22, 1970 and the predecessor International Masonry Apprenticeship Trust established under an Agreement and Declaration of Trust November 6, 1974.

SECTION 9. BACPAC - The Employer agrees to deduct an amount from the pay of each employee who is a Union member and who executes a voluntary check-off authorization form for the Bricklayers & Allied Craftworkers Political Action Committee (BACPAC). Deductions shall be in the amount and at the intervals specified on the check-off authorization form. The Employer agrees to transmit BACPAC deductions by purchase of weekly fringe benefit stamps.

The deductions shall continue for those employees who sign BACPAC authorization forms unless they are revoked individually and in writing.

SECTION 10. INTERNATIONAL UNION PENSION - The Employer agrees to contribute, by stamp purchase, the amount shown in wage addendum, per hour for each paid hour within the jurisdiction of the Belleville Chapter to the Bricklayers Local #8 Belleville Chapter Fringe Fund.

SECTION 11. The Employer hereby agrees to be bound by and to the above stated Agreements and Declarations of Trusts, as though he had actually signed the individual documents and further agrees to be bound by all actions taken by the Trustees of these funds pursuant to said Agreements and Declarations of Trust.

SECTION 12. The Employer hereby irrevocably designates as its representative on the above stated Boards of Trustees such Trustees as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.

SECTION 13. All contributions and reports shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Public Accountant audit the time books, payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the funds designated in Section 1 of this Article. Any Employer found, as a result of an audit ordered by the Trustees of one of the fringe benefit funds, to have been substantially inaccurate in reporting shall be charged the full costs of such audit.

SECTION 14. If the Employer fails to make any contribution or reports specified in this Article, within fifteen (15) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary, including the withdrawal of manpower, to secure compliance with this Agreement, any other provision, hereof to the contrary notwithstanding, and the Employer shall be liable for all costs for collection of payments due together with attorney's fees and such liquidated damages will be assessed at a minimum rate of 1 ½ percent per month by the Trustees. The Employer's liability for payment under this Article shall not be subject to or covered by any grievance or arbitration procedure or any "no strike" clause which may be provided for or set forth elsewhere in this Agreement.

SECTION 15. Any increase in the Southwest Illinois Pension or Health & Welfare Trust during the period of this Collective Bargaining Agreement as deemed necessary and recommended by the Trustees of said Trust, shall be deducted from the Journeyman base scale at no additional cost to the Employer.

SECTION 16. MERGED TRUST FUNDS - In the event of the trust funds to which contributions are required to be made under this Agreement is merged with or into another trust fund, the contributions shall then be made to the successor fund.

materials to be reinstalled, final sandblasting of surfaces to receive additional refractory materials, installation of chemical castings, fire-proofing, spraying of all refractory materials, cleaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by employees represented by BAC, in cooperation with other trades.

(c) In addition, all other assignments mutually agreed upon between the Employer and the Union on any other building products or systems related to the scope and type of work covered by this Agreement which may be developed in the future that are determined by these parties to fall within the work jurisdiction of this Agreement.

## SECTION 2. Hours and Shifts

**(A) Hours:**

Eight (8) hours work per day shall constitute a day's work, forty (40) hours work per week. Monday through Friday, inclusive shall constitute a week's work. The normal starting time shall be 8:00 a.m.. Normal quitting time shall be 4:30 p.m. with a thirty (30) minute unpaid lunch period occurring in the middle of the shift. The normal starting and quitting time may be changed by mutual consent of the Employer and the jobsite Local Union. The schedule of approved shifts which can be adopted by mutual consent of the Employer and the Field Representative of the jobsite Local Union is identified in paragraph B (3) below. The parties to this Agreement recognize the desirability and in some cases absolute necessity of coordinating the shifts to be worked with the other trades involved on the project and the customers work schedule.

**(B) Shifts:**

1. At least six (6) consecutive shifts shall be required to establish a shift operation. Once shift work is established, it will continue equally until completion of the job.

2. When two (2) or three (3) shifts are worked, eight (8) hours shall constitute a full shift with nine (9) hours pay, and an employee shall be allowed thirty (30) minutes for lunch within the eight (8) hours working period with pay.

3. The first shift shall start at 8:00 a.m., lunch period at 12 o'clock noon. Second shift shall start at 4:00 p.m., lunch period at 8:00 p.m.. Third shift shall start at 12 o'clock midnight, lunch period at 4:00 a.m..

4. When employees work their regular eight (8) hour shift on shift work and continue to work two (2) hours past their regular quitting time, they shall be allowed thirty (30) minutes to eat their lunch at that time, and shall be given lunch at four (4) hour intervals thereafter. If less than two (2) hours, they shall be paid at the overtime rate of pay for time worked, plus thirty (30) minutes at the regular rate of pay for lunch. (This does not apply to foreman's relieving time).

5. On shift work differential pay (one (1) hour at straight time) shall be paid at the total hourly package, including full fringes for each shift worked Sunday through Saturday. Differential to be paid at the beginning of the shift.

23

## ARTICLE XIV
## Fund Administration

SECTION 1. By delegating its bargaining rights to the Association or by executing a copy of this Agreement, each Employer agrees to be bound to the terms of the respective trust agreements referred to in Article XIII and agrees to the right of the Trustees to collect delinquent payments by any legal means.

SECTION 2. It shall be the responsibility of the Employer to insure his "Employer Contribution Report" is returned to the Bricklayers Local #8 Belleville Chapter Fringe Fund, #2 Terminal Drive Suite 19A, P.O. Box 40, East Alton, IL 62024, BEFORE THE 15TH OF EACH MONTH. There shall be a $5.00 administration charge added to the Employer for delinquent reports after the 15th of each month for the first five (5) days of delinquency. There shall be a $10.00 administration charge to the Employer for each seven (7) days of delinquency thereafter, or portion thereof, until such time as the report is received. After fifteen (15) days of delinquency it shall be designated as a violation of this contract by the Employer and turned over to the Field Representative and/or President for action. Where an Employer does not work within the jurisdiction of the Union for any said month, he shall be sent an "Employer Contribution Report" and it shall be his responsibility to return the report with "NO HOURS WORKED" written across the sheet, otherwise, his report shall be deemed delinquent even though he had no man hours for that month.

SECTION 3. Employees shall receive their fringe stamps, as provided elsewhere in this Agreement, on their regular payday. In addition thereto, inasmuch as the fringe stamp provisions of this Agreement constitute part of the wage package of covered employees, any employee not paid in conformity with this article shall be entitled to waiting time until the provisions of this article are complied with at the rate of double time for no more than eight (8) hours per working day for every working day employer is in violation of this article. If any Employer is found to be in violation of any section of this article, the Union shall have the authority to cease work forthwith until such time the delinquency is paid in full.

## ARTICLE XV
## Refractory Section

SECTION 1.

(a) The provisions of this Article shall apply to all new refractory construction, all refractory maintenance and repair projects, and all on-going plant refractory maintenance (i.e., plant refractory maintenance performed by steady, full time employees who are part of a work force having assured employment for a minimum of twelve (12) months) contracted for by Employers operating regionally and nationally in industrial plants such as, but not limited to, mining facilities, manufacturing plants, power plants, iron and steel production facilities, paper mills, cement plants, breweries, rubber production and tire manufacturing plants, refineries and synthetic fuel manufacturing facilities. Except as specifically set forth in this Article, refractory work shall be done under the same terms and conditions as are set forth in the remainder of this Agreement.

(b) The Employer agrees to assign to employees represented by BAC all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftworkers, including but not limited to: dipping, setting, buttering, bedding, hanging, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, flagging, leveling, installation of gaskets and expansion joint material, grinding, vibrating, tamping, gunniting, insulating and spraying of all refractory materials by all means including bolting and welding, removal and cleaning of masonry

22

SECTION 3. Safety

(a) The Employer agrees to conform to all rules and regulations prescribed by the Occupational Safety and Health Act or applicable state standard.

(b) When employees are working on a job and other workmen are working above them, employees shall be provided with a proper covering by the Employer to protect them from danger. No employee shall be required to work in any hazardous location without proper safety precautions.

(c) Hard hats, goggles, respirators, safety toes, and other safety equipment as required shall be furnished by the Employer at no expense to the employees.

(d) The Employer shall provide respirators to each employee as needed. When working with asbestos based materials and silica, respiratory protective devices shall be appropriate for the hazardous material involved and the extent and the nature of the work performed.

(e) Eye and face protection shall be provided on any work which presents potential eye or face injury.

(f) Employees involved in welding operations shall be furnished with proper welding hood and lenses for eye protection and protective clothing.

(g) All welding shall be adequately shielded to protect anyone in the vicinity.

(h) The Employer shall take suitable precautions to detect and prevent employees from being exposed to toxic gases.

(i) Employers doing industrial work other than sand and cement and lime mortar shall furnish gloves and proper clothing protection, excluding shoes. If clothing protection is not furnished by Employer, the employees shall be entitled to an allowance of $3.00 per day, for cleaning of personal clothing. Where employee is required to use his personal clothing and it is damaged, Employer shall be responsible for replacement of damaged clothing of comparable quality when such damage is found to be job related.

(j) Adequate lighting shall be provided to the satisfaction of the Steward.

(k) All accidents shall be promptly reported by the job Steward to the Union and the Employer. The Employer agrees to establish a procedure for each project which will be reviewed at the pre-job conference to insure that prompt and competent medical attention is available for any workman injured on the jobsite.

(l) The Employer shall post in a prominent place at each jobsite pertinent medical and insurance information.

SECTION 4. Scaffold

(a) Secure scaffolds with adequate work platforms and guard rails shall be provided for employees on all work. Swinging and suspended scaffolds shall be kept level. All planking shall be of select structural or premium grade lumber. All solid wood scaffold shall be of select structural or premium grade.

(b) Wall height shall not exceed four (4) feet six (6) inches above the working platform on any work except as otherwise provided in this Agreement.

24

(c) Wall height on coke oven walls shall not exceed three (3) feet six (6) inches. The top of the working platform shall be approximately six (6) inches below the top of the wall. First lift wall height shall be flexible to assure succeeding three (3) feet six (6) inches maximum.

(d) Wall height in blast furnaces shall be a maximum of three (3) feet six (6) inches from the top of the working platform. The top of the working platform shall be approximately six (6) inches below the top of the wall. On heavier walls bricklayers shall work as partners to minimize material handling.

All planking shall be of select structural or premium grade lumber. A bench scaffold four (4) feet in width must be installed every thirty (30) inches in blast furnaces. No more than one brick shall be placed under bench scaffold legs for load distribution. When solid scaffolds are used, a solid scaffold must be installed every six (6) feet. Every third scaffold must be left nailed in place for safety purposes. When a swinging or suspended scaffold is used, a level scaffold shall be maintained with the top of the working platform being approximately six (6) inches below the top of the wall around the entire perimeter of the furnace. The scaffold shall be raised when scaffold height is reached, at lunch, or between shifts. Employees shall leave work area while this operation is performed.

In stoves and wells, the top of the working platform shall be approximately six (6) inches below the top of the wall. Wall height shall be a maximum of four (4) feet six (6) inches in height. Every fourth scaffold must be left in place for safety purposes.

In the construction of all masonry chimneys and stacks where an inside scaffold is used, the working platform shall never be less than eighteen (18) inches below the top of the wall. Scaffold height in such chimneys and stacks shall not exceed four (4) feet in height.

(e) No scaffold, with the exception of bench scaffolds, shall be started or dismantled until the last course is keyed up and painted with the exception of pudlock holes.

(f) All swinging, suspended and self-supporting scaffolds shall meet or exceed OSHA or applicable state standards. Platforms shall be placed at tuyere holes inside and outside to permit easy egress to blast furnaces.

(g) There shall be no lost time during working hours for stocking or building of scaffolds.

(h) Access ladders shall be provided to all scaffolds. All ladders shall conform to OSHA or applicable state standards.

All ladders are to be staggered, not straight up and down, adequate lighting is to be provided to insure safety when ascending or descending ladders. Stopping off places to be provided every twenty (20) feet with a back rest. An emergency ladder is to be suspended from the top of all blast furnaces and stoves. As a safety precaution, steel brackets shall be welded twenty (20) inches away from the shell to which a wooden ladder can be bolted to insure a safer ascent or descent for the bricklayer, using the shell as a back rest.

SECTION 5. Jobsite Conditions

(a) Employees must be provided with a suitable shed or room for storage of tools, changing clothes, and eating meals. The shed shall be well lighted, heated during cold weather, and kept clean, and shall be a reasonable distance from the work area. The shed shall be for the exclusive use of the employees in this

25

(p) The Employer shall furnish kerosene or diesel oil for soaking tools in each shift while men are working on carbon or acid brick.

(q) A ten (10) minute period for cleaning up shall be allowed at lunch and quitting time when employed on firebrick work.

(r) When employees are required to park one-half mile away or more, they shall be provided suitable transportation from parking area to job location including protection during inclement weather. The Employer agrees to provide suitable transportation on projects over one-fourth mile from the parking lot and storage shed for transporting the employee's tools to and from the jobsite at the beginning and end of the project.

(s) All stock on firebrick shall not be higher than four (4) feet.

(t) All members shall use sanitary provision as provided.

(u) Adequate cables shall be on all hanging lights in all types of furnaces and stoves, etc, to serve the purpose of safety.

(v) Any refractory shall be installed by the bricklayers.

(w) When bricklayers are engaged in laying of brick, the Employer shall provide said members with respirators where dusty conditions prevail. They shall be the same standard as the Dustfoe #66 and Employer shall provide safety goggles on work that impairs the eyes, Employer shall wet down all dusty places whenever possible.

Employer shall provide precautionary measures on jobs where gas exists so bricklayers may be warned in due time for their safety. It shall be the responsibility of Stewards that gas meters are in places where the possibility of gas may exist, and the Steward shall take the gas checks. The Employer shall provide proper counter fatigue aid which shall meet the standards prescribed by the State Medical Board, proper gloves and protective materials to safe-guard bricklayers when they are handling hot work. Employer shall supply wood en shoes or facsimile when working on heated surface.

(x) When bricklayers are working on blast furnaces, stoves, dust catchers, stacks, or other firebrick jobs where scaffolds are used, the Employer will have fire extinguishers on the scaffold at all times.

(y) When employees are sent from one job to another during working hours, they shall be compensated at the regular rate of pay for their time and in no case may they be moved during their lunch period.

(z) Apprentices shall not be permitted to operate saws until they have completed at least 2250 hours of their apprenticeship.

(aa) **Dry cutting and wet cutting precautions:** Where dry cutting machines are used, the Employer shall furnish a mask to cover the operators' mouth and nose, and shall also furnish safety goggles and ear protection where required: and where wet cutting machines are used, there shall be furnished in addition to the above-mentioned safety articles, a pair of rubber gloves, rubber boots, rubber apron, and a dry elevated platform. Enclosure and heat shall be provided during winter months for wet cutting on saw. All dry cutting machines used by employees are to be furnished with some mechanical or suction device to draw and keep away the dust at all times from the operator, and all cutting machines shall be grounded before operated, the ground wire to be not less than #8 wire.

27

---

bargaining unit. A separate shed of adequate size to accommodate employees of each shift shall be provided. Employer shall furnish adequate sanitary and washing facilities on all jobs.

(b) The Employer shall be responsible for loss of tools and/or clothing when such loss is the result of fire or burglary up to $250.00. Employees shall furnish an itemized statement covering any loss due to fire or burglary.

(c) Employer shall furnish an adequate supply of portable chilled drinking water on all jobs. All water containers and drinking cups shall comply with state and federal sanitary codes.

(d) A line furnished by Employer shall be used on every course, and on backup work, wherever practical. Employees shall not be required to work ahead of the line.

(e) All units weighing more than thirty-five (35) pounds shall be laid by two (2) bricklayers. This provision shall not apply to bottom block.

(f) To avoid abuses in blast furnace work, every effort shall be made to keep the lead no more than four (4) courses ahead of the key. Bricklayers shall work together to level up the wall and key all courses. Bricklayers shall not start more than one course of bottom block at a time unless no grinding is involved.

(g) Backfill and vibrating of all refractory materials with electrical vibrators or any other methods shall be performed by bricklayers. When dry packing is used, air horns shall be installed for proper ventilation. The ventilations shall be determined by OSHA or applicable state standards.

(h) Coke oven walls over eighteen (18) inches thick shall be saddled by two (2) bricklayers and the line shall be raised on both sides at the same time.

(i) When insulation is required to be installed on the interior of a vessel in conjunction with refractory materials, insulation shall be installed at least to scaffold height before brick or other materials are stockpiled, whenever possible.

(j) Employer shall make substantial effort to control or eliminate dust wherever possible.

(k) When an employee is laid off or discharged, he shall be paid in full all compensation due, one-half hour before layoff.

(l) The Union and Employer agree that no employee shall be denied employment, penalized, disciplined, or in any way disadvantaged because of age, race, religion, sex, or place of national origin.

(m) When bricklayers are employed on hot work, Employer shall provide proper counter fatigue aids which shall meet OSHA or applicable state standards.

(n) Tools shall be sharpened at the Employer's expense. If tools are not sharpened, carboloy tips shall be furnished and installed at the Employer's expense. If tips are not available at completion of job, or layoff, bricklayer shall receive two (2) hours pay including all fringe benefits.

(o) All bricklayers, while working on carbon or acid brick shall be allowed ten (10) minutes at lunch time and ten (10) minutes at quitting time to clean up. The Employer shall furnish cleaning cloths, detergents and wash areas for the bricklayers to use on such work.

26

(bb) Masonry power saws shall be operated only by an employee in the bargaining unit and only on the site of the operation. Both safety shield and dust collector must be kept in good condition whenever saw is in operation.

### ARTICLE XVI
### Picket Line

It shall not be a violation of this Agreement, and it shall not be a cause for discharge or disciplinary action, or grounds for temporary or permanent replacement, in the event an employee refused to enter upon any property involved in a lawful primary labor dispute, or refused to go through or work behind any lawful primary picket line, including the lawful primary picket of the Union party to this Agreement or other Unions, and including a lawful primary picket line at the Employer's place of business or elsewhere.

### ARTICLE XVII
### Non-Discrimination

No individual shall be discriminated against because of race, sex, age, religion, national origin or union membership. The parties further recognize the applicable provisions of the Civil Rights Act of 1964, the Age Discrimination Employment Act, the American with Disabilities Act, The National Labor Relations Act, Executive Order 11246, all as may be amended, and any affirmative action programs of the parties in addition to future laws which would be applicable to this Agreement.

### ARTICLE XVIII
### Arbitration

SECTION 1. An applicant for employment or any employee who is aggrieved by an action of the Union with respect to registration or referral or who is aggrieved by action of the Employer in connection with hire hereunder, must, within ten (10) days of the occurrence of the event file a written statement of the grievance with the Union and the Employer, otherwise the grievance shall be deemed waived. Upon such filing, the grievance shall be considered and disposition thereof made within ten (10) days by a Joint Arbitration Board consisting of a representative of the Union, a representative of the Employer, and an impartial chairman appointed jointly by the Employer and the Union. Such Board shall consider the grievance and render a decision which shall be final and binding. The cost of the third party shall be borne equally by all parties involved.

SECTION 2. The Stewards or the Field Representative shall adjust all grievances that may arise on the job and shall be assisted by the members on the job. If the grievance cannot be settled at this level then the grievance shall be referred to the Union and the Employer for settlement. There shall be no slow downs or work stoppages. Any employees who violate this section may be discharge. There shall be no lockouts by the Employer.

SECTION 3. Should any differences arise between the Employer and the Union or its members employed by the Employer as to the interpretation or application of, or compliance with the provisions of this Agreement, there shall be no interruption or impeding of the work, work stoppage, strike, or lockouts on account of such difference, but an earnest effort shall be made by the Employer and the Union to settle such difference orderly and promptly in accordance with the grievance procedures of Article XVIII other than for non-payment of wages and fringe benefits.

28

SECTION 4. Article XVIII shall not apply in those cases where an Employer fails or refused to make in whole or in part any payments required under this Agreement including all wages, local union fringe benefits or other contributions that have been established through bona fide collective bargaining.

### ARTICLE XIX
### Validity and Termination

SECTION 1. Should any provision of this Agreement be in conflict with or violative of any existing law, then such provision shall be re-negotiated by the parties for the purpose of legalizing and validating same. Pending such legalization all other provisions of this Agreement shall continue in full force and effect and be binding upon the parties.

SECTION 2. The Agreement shall be effective commencing August 1, 1998 and shall continue in full force to and including 31 July 2003, unless written notice of decision to negotiate a new Agreement, in whole or part, is given in writing, by either party to the other, no later than sixty (60) days, but not more than ninety (90) days prior to the expiration date.

If the parties fail to reach an Agreement in such negotiations, the issues in dispute shall be submitted to the Federal Mediation & Conciliation service, Department of Labor. The parties may at any time mutually agree to change or amend any part of this Agreement and such changes or modifications shall not affect the continuing nature of this Agreement. Wages and fringes are to be paid by the Employer as provided in Article VI, Section 1.

### ADDENDUM A
### WAGES

**Effective 1 August 1998 through 31 July 1999**

| | |
|---|---|
| Journeyman base scale | 20.85 |
| Vacation | 2.00 |
| Taxable dues & fringe benefits checkoff | 1.12 |
| Total taxable wage | 23.97 |

**EMPLOYER CONTRIBUTION**

| | |
|---|---|
| Pension | 1.55 |
| Health & Welfare | 3.40 |
| Local Annuity | 1.25 |
| International Pension | 1.20 |
| Local Joint Apprentice Trust | .05 |
| International Masonry Apprentice Trust | .15 |
| Masonry Industry Fund | .08 |
| I.M.I. | .25 |
| TOTAL PACKAGE | 31.90 |
| TOTAL COST OF STAMP | 11.05 |

29

## APPRENTICE ADDENDUM A

**EFFECTIVE AUGUST 1, 1998 THRU JULY 31, 1999**

**0-750 Hours**
Appr. 40% base scale $7.31
Fringes:
H & W 1.40
Local 8 Pension 1.25
Chapter Pension 1.55
IU Pension 1.20
Appr. Fund .05

Total Fringes 5.45 to be paid when report is sent in

**751-1500 Hours**
Appr. 50% base scale $8.10
Vacation 1.00
Total Taxable Wage 9.10
Fringes:
H & W 2.40
Local 8 Pension 1.25
Chapter Pension 1.55
IU Pension 1.20
Appr. Fund .05
IMI .40

Total Fringes 7.85 to be paid when report is sent in

**1501-2250 Hours**
Appr. 60% base scale $9.21
Vacation 2.00
Local Check-Off .79
Total Taxable Wage 12.00
Fringes:
H & W 2.61
Local 8 Pension 1.25
Chapter Pension 1.55
IU Pension 1.20
Appr. Fund .05
IMI .40
Masonry Industry .08

Total Fringes 9.93 to be paid when report is sent in

31

---

## ADDENDUM B

Effective August 1, 1999 through July 31, 2000

Mason Contractors Association agree to a $1.10 increase, to the wage package, effective August 1, 1999, to be added to the Journeyman base rate, until a full Belleville Chapter meeting is held and a determination is made on the distribution of the $1.10 increase and percentage increase for apprentices.

## ADDENDUM C

Effective August 1, 2000 through July 31, 2001

Mason Contractors Association agree to a $1.10 increase, to the wage package, effective August 1, 2000, to be added to the Journeyman base rate, until a full Belleville Chapter meeting is held and a determination is made on the distribution of the $1.10 increase and percentage increase for apprentices.

## ADDENDUM D

Effective August 1, 2001 through July 31, 2002

Mason Contractors Association agree to a $1.10 increase to the wage package, effective August 1, 2001, to be added to the Journeyman base rate, until a full Belleville Chapter meeting is held and a determination is made on the distribution of the $1.10 increase and percentage increase for apprentices.

## ADDENDUM E

Effective August 1, 2002 through July 31, 2003

Mason Contractors Association agree to a $1.10 increase, to the wage package, effective August 1, 2002, to be added to the Journeyman base rate, until a full Belleville Chapter meeting is held and a determination is made on the distribution of the $1.10 increase and percentage increase for apprentices.

30

Accepted this 24 day of May, A.D. 19 83

By: _____
(Employer Name)

Agent with authority to bind Employer

## EMPLOYER INFORMATION

Company Name: Stephen Mooney

Address: 7570 Ruggle Rd.

City: Red Bud Il

State: Il   Zip: 62278

Office Phone: 618-282-6109   Mobile PH: 977-0177
(444) 338-6109

Federal Identification Number (FEIN): Stab Tran

Workmen's Compensation Carrier: _____

Policy Number: _____

Expiration date: _____

### CHECK ONE:

Corporation _____

Sole Proprietorship _____

Partnership ✓

Other _____

---

**2251-3000 Hours**
Appr. 70% base scale
Vacation                                  $11.28
Local Check-Off                             2.00
Total Taxable Wage                          1.12
                                           14.40
Fringes: FULL
H & W                        3.40
Local 8 Pension              1.25
Chapter Pension              1.55
IU Pension                   1.20
Appr. Fund                    .05
IMI                           .40
Masonry Industry              .08
Total Fringes               11.05   Stamp Weekly

**3001-3750 Hours**
Appr. 80% base scale
Vacation                                  $14.47
Local Check-Off                             2.00
Total Taxable Wage                          1.12
                                           17.59
Fringes: FULL
H & W                        3.40
Local 8 Pension              1.25
Chapter Pension              1.55
IU Pension                   1.20
Appr. Fund                    .05
IMI                           .40
Masonry Industry              .08
Total Fringes               11.05   Stamp Weekly

**3751-4500 Hours**
Appr. 90% base scale
Vacation                                  $17.66
Local Check-Off                             2.00
Total Taxable Wage                          1.12
                                           20.78
Fringes: FULL
H & W                        3.40
Local 8 Pension              1.25
Chapter Pension              1.55
IU Pension                   1.20
Appr. Fund                    .05
IMI                           .40
Masonry Industry              .08
Total Fringes               11.05   Stamp Weekly

| For Office Use Only: | Agreement Number | Rate Number | 12/22/04 |

## International Union of Bricklayers & Allied Craftsmen
### Department of Collective Bargaining Services
### 815 Fifteenth Street, N.W.
### Washington, DC 20005

## CHANGE TO WAGE AND BENEFIT FUND RATES ON FILE WITH THE INTERNATIONAL UNION

(COMPLETE A SEPARATE SCHEDULE FOR EACH RATE SET FORTH IN THE AGREEMENT)

TYPE OF WORK (Please circle): All / **Commercial** / Heavy & Highway / **Industrial** / In-Plant / **Refractory** / **Residential**

This Change in Wage and Benefit Fund Rates to the _August 1_, 1999 98 / _July 31_, 2003 Agreement by and between _Masonry Institute of Southern Illinois_ and the International Union of Bricklayers and Allied Craftsmen Local Union No. _8_ of _IL_ shall be effective commencing _August 1_, 1998. This Change to Wage and Benefit Fund Rates shall cover the crafts of (Please circle) **Bricklayer** / **Stone Mason** / Cement Mason / **Marble Mason** / Plasterer / Mosaic Worker / Terrazzo Worker / **Tile Layer** / **Pointer, Cleaner & Caulker** / Marble Finisher / Terrazzo Finisher / Tile Finisher for the counties of _Bond, Calhoun, Clinton, Fayette, Jersey, MADISON, MARION Southern ¼ of Macoupin, Monroe, Montgomery, St. Clair & Washington_ within the State of _IL_.

EFFECTIVE DATE _8/1/1998_

| | | | | |
|---|---|---|---|---|
| BASIC HOURLY RATE | $23.97 | | (DED) | $ |
| *VACATION (DED) from Phase | $2.00 | IMI (3% TOTAL PACKAGE) | | $.25 |
| IU PENSION | $1.40 | IMI MARKET & DEVELOPMENT | | $ |
| IU ANNUITY | $ | IMI APPRENTICESHIP & TRNG | | $.15 |
| MISCELLANEOUS | $ | IMI RESEARCH & DEVELOP | | $ |
| LOCAL PENSION *2 + *65 | $1.55 | _Local Apprenticeship_ | | $.25 |
| HEALTH & WELFARE | $3.40 | _Masonry Industry Fund_ | | $.06 |
| LOCAL ANNUITY *3 | $1.25 | | | $ |
| *DUES CHECK-OFF (DED) from Wages | $1.12 | | | $ |
| *BACPAC (DED) | $ | | | |
| | | **TOTAL** | | $31.40 |

* These amounts are to be included in the Basic Hourly Rate.

**For the Employer**

_Matthew McCurry_
Name (Company or Association)
_7520 Dingy Rd_
Address
_Red Bud, IL_  _62278_
City and State                  Zip Code
( _618_ ) _282-6109_
(Area Code) Phone Number

By _Paul Stetson_  Owner
Signature and Title

**For the Union**

International Union of Bricklayers & Allied Craftsmen, Local No. _8_ of _IL_

_Daniel W. McCall_
Signature
_President_
Title

NOTE: Forward a copy of this jointly signed Change to Wage and Benefit Fund Rates form to the International Union of Bricklayers and Allied Craftsmen at the address indicated at the top of this form.